IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| MICHAEL J. HAUF and LINDA M. HAUF | * | |
| | * | |
| Plaintiffs, | * | |
| vs. | * | CASE NO. 4:05-CV-109 (CDL) |
| HOMEQ SERVICING CORPORATION and THE BANK OF NEW YORK COMPANY, INC. d/b/a The Bank of New York as Trustee Under the Pooling and Servicing Agreement Dated as of August 31, 1996, Series 1996-C | * * * * | |
| Defendants. | * | |

## O R D E R

Presently pending before the Court are Plaintiffs' motions to join, for summary judgment, and to amend the complaint (Docs. 29, 42, 64). Additionally, Defendants have filed a cross motion for summary judgment (Doc. 46). For the following reasons, Plaintiffs' Motion to Join (Doc. 29) is granted. Plaintiffs' motions for summary judgment (Doc. 42) and to amend (Doc. 64) are denied. Finally, Defendants' Motion for Summary Judgment (Doc. 46) is granted in part and denied in part.

## BACKGROUND

On July 25, 1996, the Haufs obtained a loan (hereinafter "Loan") from The Money Store for $134,000, using their house as collateral. The monthly payments varied with the current interest rate. By December 8, 1998, the Haufs were over $12,000 in arrears on their mortgage. Instead of foreclosing on the home, The Money Store entered into a Forbearance Agreement with the Haufs. Under the Agreement, the Haufs made a deposit of $6,367.80 up front, and agreed to pay the

balance in twenty-four monthly installments of $265.33. During the two year Agreement, the Haufs also agreed to make their normal monthly mortgage payments. In November 2000, HomEq acquired The Money Store. The Haufs claim that they made all payments as required under the Forbearance Agreement.

On December 16, 2000, the Haufs made their final payment under the Forbearance Agreement. Attached to this final payment was a letter confirming the satisfaction of the Agreement. Thereafter, the Haufs sent their January 2001 Loan payment to HomEq. HomEq returned the January 2001 payment with a letter explaining that the Haufs were over $5,000 in arrears on their mortgage payments. HomEq admits that (1) this was an error based on several "erroneous charges" the Haufs had been assessed during the Forbearance Agreement, and (2) that the Loan was current as of December 2000. Since HomEq did not realize that the charges were in error, HomEq failed to reconcile its computer system to bring the Loan current at the completion of the Forbearance Agreement. Additionally, based on these erroneous charges, HomEq's servicing system showed the Loan in default in January 2001.

In February 2001, the Haufs mailed their February mortgage payment, which HomEq retained. On February 27, 2001, the Haufs received a letter from HomEq indicating that the Loan had been in default since November 1, 2000, and that the Haufs must pay $6,757.87 or HomEq would initiate foreclosure proceedings. In March, the Haufs submitted their March payment to HomEq and attached their previously rejected January payment. HomEq kept both of these payments. On March 8, 2001, the Haufs' attorney, Richard Flowers, sent HomEq a letter explaining that the Haufs should not be in default.

HomEq subsequently returned the Haufs' April 2001 payment. On April 16, 2001, the Haufs received another letter from HomEq claiming they were in default and that HomEq could foreclose on their house.[1] On April 23, 2001, the Haufs received a letter from HomEq notifying them that a foreclosure ad was running in the paper and that the foreclosure would occur on June 5, 2001. In response, the Haufs sent a letter dated April 24, 2001, to Morris, Schneider & Prior, LLC, HomEq's attorneys in charge of the foreclosure, explaining that the Loan was not in default. Attached to this letter was (1) the Forbearance Agreement, (2) a copy of the forbearance payment schedule, (3) copies of each certified check (representing the mortgage payment and forbearance payment) paid to HomEq during the Forbearance Agreement, (4) the letter sent to HomEq in December 2000 finalizing the Forbearance Agreement, (5) copies of the letters sent by HomEq between December 2000 and April 2001 claiming that the Loan was in default, and (6) copies of the letters sent by the Haufs and Mr. Flowers to HomEq trying to determine why the Loan was considered in default. Thereafter, HomEq agreed to suspend the June 5 foreclosure.

From May until September, 2001, Mr. Flowers and the Haufs continued to contact Morris, Schneider & Prior and HomEq to determine why the Loan was considered in default. Also during this time, HomEq refused to accept mortgage payments from the Haufs. In September 2001, HomEq rescheduled the foreclosure for October 2, 2001. On October 1, 2001, in order to stop the foreclosure proceedings, the

---

[1] HomEq admits that it sent the foreclosure letters, but claims that these letters were automatically generated by the servicing system.

3

Haufs filed for protection under Chapter 13 of the bankruptcy code in the United States Bankruptcy Court for the Middle District of Georgia.

    A.   <u>2001 Bankruptcy</u>

On October 18, 2001, the Haufs filed their Chapter 13 Statement of Financial Affairs. In Schedule B—the Personal Property Schedule—the Haufs failed to state that they had a potential claim against HomEq for wrongful foreclosure or breach of contract. On November 2, 2001, HomEq filed a proof of claim with the bankruptcy court alleging that the Haufs were $15,626.96 in arrears on the Loan. On November 20, HomEq amended its proof of claim to $16,894.45. On January 14, 2002, the Haufs' Chapter 13 Plan was confirmed.

The Haufs filed an objection to HomEq's proof of claim on October 24, 2002. In this objection, the Haufs explained that they fulfilled their obligations under the Forbearance Agreement, that they were not in default in January 2001, and that HomEq failed to correct its error. On January 15, 2003, the bankruptcy court issued an order disallowing HomEq's proof of claim, directing HomEq to recompute the Haufs' arrearage amount, and requiring HomEq to explain how it arrived at the new arrearage amount. HomEq complied with this order on March 13, 2003, and submitted a payment history for the Loan which showed the May 1999 through January 2000 payments as missing. HomEq also moved for reconsideration of the January 15 order disallowing the proof of claim. On December 5, 2003, the bankruptcy court entered an order allowing the proof of claim but reducing the amount to $10,179.54. The Haufs admit that they owed HomEq $10,179.54 because that was the amount of mortgage payments that HomEq refused during 2001 before the Chapter 13 case was filed.

4

On November 24, 2004, the Haufs received a letter from the bankruptcy trustee explaining that their payments were complete under the bankruptcy plan. Therefore, the Haufs were directed to make their regular monthly mortgage payments to HomEq starting January 1, 2005. The bankruptcy court entered an order discharging the Haufs as debtors on March 1, 2005, and the Chapter 13 bankruptcy case was closed on March 29, 2005.

B. 2005 Bankruptcy

From January to May 2005, the Haufs tendered, and HomEq accepted, their monthly mortgage payments. On May 18, 2005, the Haufs received a letter rejecting their June 2005 payment and explaining that the Loan was again in default. HomEq claims that this was the result of a failure to adjust the account balance after the proof of claim was reduced by the bankruptcy court. This error in the computerized servicing system resulted in the initiation of automatic foreclosure proceedings against the Haufs. The Haufs sent their June payment again with a letter explaining that they were not in default. HomEq scheduled a foreclosure for July 5, 2005 and rejected the June payment a second time. On June 30, 2005, the Haufs filed their second Chapter 13 Bankruptcy case in order to stop the foreclosure.

C. Wrongful Foreclosure Action

On September 16, 2005, the Haufs moved to amend their 2005 bankruptcy schedule to include a possible cause of action against HomEq. The schedule was amended and on September 27, 2005, the Haufs filed this case alleging wrongful foreclosure and breach of contract. On October 25, 2005, HomEq answered claiming that the Haufs' claims were partially barred by judicial estoppel based upon their failure to list this cause of action in the 2001 bankruptcy schedules. The

5

Haufs then moved to reopen the 2001 bankruptcy case on March 24, 2006 so that they could amend their schedules to include this cause of action against HomEq. Additionally, on June 2, 2006, the Haufs moved to vest their claim against HomEq in the bankruptcy trustee. After a hearing on the motions, on June 14, 2006, the bankruptcy court ordered that the 2001 bankruptcy case be reopened and that the Chapter 13 trustee be vested with "any claim of the [Haufs'] against HomEq Servicing Corp. that existed at the time of the filing of [the 2001 bankruptcy]." (Vesting Order 2, June 14, 2006.)

On June 23, 2006, the Haufs amended their 2001 bankruptcy schedule to include this cause of action against HomEq. Accordingly, on June 26, 2006, Plaintiffs moved to join the Chapter 13 trustee as a plaintiff. Plaintiffs filed for partial summary judgment in this case on July 1, 2006, and Defendants moved for summary judgment on July 3, 2006. Plaintiffs then moved to amend their complaint to add a claim for loss of consortium on August 10, 2006. On July 20, 2006, HomEq appealed the bankruptcy court's June 14, 2006 orders reopening the 2001 bankruptcy and vesting the Haufs' claim against HomEq in the bankruptcy trustee. This Court affirmed the bankruptcy court's orders on January 23, 2007. Thus, presently pending before the Court are Plaintiffs' motions to join, for summary judgment, and to amend, and Defendants' Motion for Summary Judgment. The Court addresses all four pending motions in this Order.

DISCUSSION

**I.    Motion to Join**

Plaintiffs move to join the Chapter 13 bankruptcy trustee, Kristin Hurst, as a plaintiff. Ms. Hurst has consented to pursue this

action for the Chapter 13 bankruptcy estate. In order to be joined as a party to an action, a person must have standing under Article III to pursue the action, and that person must meet the requirements of Federal Rules of Civil Procedure 19 or 20. Instead of arguing that Ms. Hurst fails to satisfy the requirements for joinder under the Federal Rules of Civil Procedure, Defendants claim that a Chapter 13 bankruptcy trustee lacks standing to pursue a cause of action that arose before the filing of the bankruptcy petition. Defendants therefore contend that Ms. Hurst lacks standing and should not be joined as a plaintiff to this action. For the following reasons, the Court finds that a Chapter 13 trustee has concurrent standing with a debtor in possession to pursue a pre-petition cause of action.

Whether a Chapter 13 trustee has standing to pursue such a claim has not been addressed by the Eleventh Circuit and cannot be resolved from a clear reading of the statutory language alone. *See, e.g., Crosby v. Monroe County*, 394 F.3d 1328, 1331 n.2 (11th Cir. 2004) (explaining that a debtor in a Chapter 13 case "retains standing to pursue legal claims on behalf of the [bankruptcy] estate," but failing to address whether the debtor and trustee have concurrent standing). An examination of the legislative history and precedent from other circuits is helpful in resolving this issue of first impression in this circuit.

Section 323(b) of the Bankruptcy Code gives the trustee in a bankruptcy case the "capacity to sue and be sued." 11 U.S.C. § 323(b). Read in a vacuum, one could argue that the statutory language provides unequivocally that the trustee has standing. It states that a trustee can sue and be sued; thus, the trustee has legal standing to pursue claims of the bankruptcy estate. However, this

7

general provision must be read in the context of a Chapter 13 case. Since a Chapter 13 debtor remains in possession of the estate property and exercises some control over the estate assets, 11 U.S.C. § 1306(b), the question arises as to whether the debtor's possession operates to the exclusion of the trustee's general right to assert claims on behalf of the bankruptcy estate.

> The legislative history of § 323(b) explains that § 323
>
> grants the trustee the capacity to sue and to be sued. If the debtor remains in possession in a chapter 11 case, section 1107 gives the debtor in possession these rights of the trustee: the debtor in possession becomes the representative of the estate, and may sue and be sued. The same applies in a chapter 13 case.

S. Rep. No. 95-989, at 37 (1978). Additionally, § 1303 of the Bankruptcy Code grants the Chapter 13 debtor certain exclusive powers. 11 U.S.C. § 1303. The legislative history of § 1303 explains that § 1303 "does not imply that the debtor does not also possess other powers concurrently with the trustee. For example, although section 1323 [sic] is not specified in section 1303, certainly it is intended that the debtor has the power to sue and be sued." 124 Cong. Rec. H11 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards). As explained by one court, "[a]lthough the Bankruptcy Code is not explicit on the point, it is clear Congress intended to provide chapter 13 trustees and chapter 13 debtors with concurrent capacity to litigate pre-petition nonbankruptcy law claims." *Travelers Indem. Co. of Ill., Inc. v. Griner* (*In re Griner*), 240 B.R. 432, 437 (Bankr. S.D. Ala. 1999).

The Federal Rules of Bankruptcy Procedure also support the conclusion that the trustee and debtor have concurrent standing. Federal Rule of Bankruptcy Procedure 6009 states that a "trustee *or*

8

debtor in possession may prosecute or may enter an appearance and defend any pending action or proceeding by or against the debtor, or commence and prosecute any action or proceeding on behalf of the estate before any tribunal." The Seventh Circuit considered Rule 6009 persuasive in determining that under Chapter 13, "the debtor-in-possession steps into the role of the trustee and exercises concurrent authority to sue and be sued on behalf of the estate." *Cable v. Ivy Tech State Coll.*, 200 F.3d 467, 473 (7th Cir. 1999). This Court agrees with the Seventh Circuit and finds that the trustee in this case has standing to pursue this action. *See also Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513, 515-16 (2d Cir. 1998); *Beasley v. Pers. Fin. Corp.*, 279 B.R. 523, 528 n.1 (S.D. Miss. 2002). Ms. Hurst, therefore, has standing to pursue this action for the Chapter 13 bankruptcy estate. Thus, the Motion to Join is granted, and Ms. Hurst is added as a Plaintiff.

**II. Motions for Summary Judgment**

    A. <u>Summary Judgment Standard</u>

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). This burden can be met by showing that the non-moving party will be unable to "establish the existence of an element essential to [the non-moving party's] case, and on which [the non-moving party] will bear the burden of proof at trial. *Id.* at 322.

9

Once the moving party has met its burden, the burden shifts to the non-moving party to show that there *is* a genuine issue of material fact. *Id.* at 324. A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue if the evidence would allow a reasonable jury to find for the non-moving party. *Id.* In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

B. Discussion

Plaintiffs move for partial summary judgment on their claims for wrongful foreclosure and breach of contract. Defendants move for summary judgment on all of Plaintiffs' claims, or in the alternative for partial summary judgment on Plaintiffs' claims (1) for the 2001 wrongful foreclosure, (2) for damages based on emotional distress, (3) for punitive damages in excess of $250,000, and (4) which accrued before filing the 2001 bankruptcy action. For the following reasons, Plaintiffs' motion is denied. Defendants' motion is granted in part and denied in part.

1. *Statute of Limitations—2001 Foreclosure*

As a threshold matter, Defendants contend that Plaintiffs' wrongful foreclosure action for the 2001 attempted foreclosure is barred by the applicable statutes of limitations. Plaintiffs concede that they cannot assert claims for personal injury, emotional distress, or injury to reputation based on the 2001 attempted foreclosure. Plaintiffs argue, however, that they can assert a claim for "damages they experienced to their property rights for the four years prior to the date the Complaint was filed." (Pl.'s Resp. in

10

Opp'n to Def.'s Mot. for Summ. J. 18.) This argument appears to be a convoluted attempt by Plaintiffs to recover damages for trespass—which has a four year statute of limitation—through their wrongful foreclosure action. O.C.G.A. §§ 9-3-30, 51-9-1; *See also Tacon v. Equity One, Inc.*, 280 Ga. App. 183, 188, 633 S.E.2d 599, 603 (2006) (explaining that the "common law rule [of trespass] is codified in O.C.G.A. § 51-9-1, which provides that every act that unlawfully interferes with a citizen's right of enjoyment of his private property "is a tort for which an action shall lie").

While there may be a set of circumstances where an attempted wrongful foreclosure causes a trespass or property damage, Plaintiffs have not alleged any such injury here. Furthermore, Plaintiffs have not stated a claim for trespass because they failed to allege an entry onto their property. *Pope v. Pulte Home Corp.*, 246 Ga. App. 120, 122, 539 S.E.2d 842, 843 ("A person commits trespass when he knowingly and without authority enters upon the land of another . . . ."). Therefore, the four year statute of limitations for trespass is inapplicable to Plaintiffs' claim for wrongful foreclosure. Defendants' Motion for Summary Judgment is hereby granted as to Plaintiffs' claims for personal injury, emotional distress, and injury to reputation premised upon the 2001 attempted foreclosure.[2] Additionally, to the extent that Plaintiffs were attempting to assert a claim for trespass premised upon the 2001 foreclosure, the Court grants Defendants' Motion for Summary Judgment on that claim.

---

[2] The Court notes that Plaintiffs' claims for breach of contract (which has a six year statute of limitations) which arose out of the 2001 attempted foreclosure are not time barred.

11

### 2. *2005 Attempted Wrongful Foreclosure*

Each party claims it is entitled to summary judgment on Plaintiffs' 2005 attempted wrongful foreclosure claim. In order to maintain a claim for an attempted wrongful foreclosure, a plaintiff must show that a creditor (1) knowingly and intentionally published "untrue and derogatory information concerning the debtor's financial condition," and that (3) "damages were sustained as a direct result of this publication." *Aetna Fin. Co. v. Culpepper*, 171 Ga. App. 315, 319, 320 S.E.2d 228, 232 (1984). Defendants claim they are entitled to summary judgment on Plaintiffs' 2005 attempted wrongful foreclosure claim because the Haufs have not presented any evidence that meets the first element of the test for attempted wrongful foreclosure. Specifically, Defendants argue that the attempted foreclosure resulted from an error in HomEq's computerized loan servicing system; thus, there was no intentional or knowing publication of untrue information involving the Haufs' financial condition. The Court rejects Defendants' argument and finds that there is a material question of fact as to whether Defendants' actions were knowing and intentional. Therefore, as further explained below, summary judgment is not appropriate.

The Haufs have shown that Defendants published untrue and derogatory information about their financial condition. It is undisputed that the Haufs were not in default on the Loan in 2005. It is further undisputed that Defendants published a "Notice of Sale Under Power" that stated that the Haufs' Loan is "hereby declared due because of default under the terms of said [Loan], including but not limited to the nonpayment of the indebtedness as and when due." (Dunnery Dep. Ex. 67, Feb. 22, 2006.) HomEq also admits that "the

12

default and foreclosure notices in 2005 should not have been sent." (Br. in Supp. of Defs.' Mot. for Summ. J. 6.) Therefore, the issue on summary judgment is whether Defendants knowingly and intentionally published this untrue information about the Haufs.

Defendants contend that HomEq's computerized loan system showed the Haufs to be in default in 2005 because of several employee and computer errors. Since no one at HomEq discovered these errors, Defendants claim they believed the Haufs to actually be in default. Consequently, because Defendants believed the Haufs were in default, they had no intent to publish false information about the Haufs.

The evidence shows, however, that the Haufs attempted to stop the 2005 foreclosure by: (1) contacting HomEq, HomEq's attorneys in charge of the foreclosure, and HomEq's Loss Mitigation Department, (2) informing HomEq and HomEq's attorneys that they were not in default, (3) explaining to HomEq that they believed the "default" was the result of an error—HomEq's failure to adjust the proof of claim down from $16,894.45 to $10,179.54, and (4) attaching a copy of a bankruptcy court order which reduced the proof of claim. HomEq admits that the Haufs contacted it on several occasions and that the Haufs explained to HomEq that they were not in default. (Dunnery Dep. 80:4-15.) Additionally, John Dunnery ("Dunnery"), a Vice President for HomEq, explained that he does not know "why[,] based upon the communication that [the Haufs] had with HomEq's organization[,] their issue was not addressed correctly before [the foreclosure] happened." (Dunnery Dep. 81:24-82:2.) Dunnery guessed, however, that HomEq continued with the foreclosure, despite the Haufs' communications, because "either the correspondence did not get to the right location in our organization for it to be addressed, or if [it] did, it wasn't

13

sufficiently addressed." (Dunnery Dep. 80:22-24.) This evidence creates an issue of fact as to whether or not Defendants intended to publish false information about the Haufs. *See, e.g., Stuart v. Hayden*, 169 U.S. 1, 8 (1898) ("The intent with which an act was done may be proved by the declarations of the party concerned, or by facts and circumstance from which the existence of the intent may be reasonably inferred."); *Crabb v. State*, 88 Ga. 584, 584, 15 S.E. 455, 455 (1892) ("[K]nowledge may be inferred from circumstances as well as proved by direct evidence. Good reason to know is equivalent to knowledge; willful ignorance will not avail."). Consequently, the parties' motions for summary judgment based on the 2005 attempted wrongful foreclosure claim are denied.

### 3. *Emotional Distress Damages*

Defendants assert in their Motion for Summary Judgment that Plaintiffs are not entitled to emotional distress damages. Plaintiffs seek recovery for emotional distress, including mental anguish, worry, and worsening mental conditions, caused by the attempted wrongful foreclosure. In determining whether a claim for emotional distress damages is sustainable, the Georgia Courts have made a distinction between claims based upon negligently inflicted emotional distress and intentionally inflicted emotional distress. Generally, to recover emotional distress damages arising from negligent conduct, the plaintiff must also have suffered a physical injury. *See Lee v. State Farm Mutual Ins. Co.*, 272 Ga. 583, 584, 533 S.E.2d 82, 84 (2000) (explaining impact rule). No such physical injury requirement exists, however, if the mental distress arises from an intentional tort. *See McCarter v. Bankers Trust Co.*, 247 Ga. App. 129, 133, 543 S.E.2d 755, 758 (2000)("[W]here emotional damages are sought for an action for

14

intentional wrongful foreclosure, such are recoverable as tort damages.") (citations omitted). Therefore, to the extent that Plaintiffs assert a claim for emotional distress based upon Defendants' negligence, Defendants' Motion for Summary Judgment is granted as to that claim. To the extent that Defendants seek summary judgment as to Plaintiffs' claim for emotional distress damages based upon Defendants' alleged intentional misconduct, the Court finds that genuine issues of material fact exist to be tried, and Defendants' motion is denied as to that claim.

    4. *Breach of Contract*

Each party contends it is entitled to summary judgment on Plaintiffs' claims for breach of contract. In their Amended Complaint, Plaintiffs claim that Defendants breached provisions contained in the Adjustable Rate Note, Security Deed, and Forbearance Agreement. Preliminarily, the Court notes that there is no merit to Defendants' contention that an action cannot sound in both tort and contract in this case. "It is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort as well." *Orkin Exterminating Co. v. Stevens*, 130 Ga. App. 363, 365, 203 S.E.2d 587, 590 (1973). The fact that Georgia courts have found that an action sounds in tort for wrongful foreclosure does not exclude an action for a breach of contract. In fact, the duty breached in a wrongful foreclosure tort action "arise[s] from a contractual right." *Clark v. West*, 196 Ga. App. 456, 457, 395 S.E.2d 884, 886 (1990). Thus, Plaintiffs can assert a claim for breach of contract for Defendants' actions.

Having determined that the Plaintiffs can assert a breach of contract claim, the Court finds that summary judgment is appropriate

15

for the Defendants on Plaintiffs' claim that the Security Deed was breached when Defendants placed a hazard insurance policy on Plaintiffs' property. Defendants have presented evidence that the Haufs were never charged for the hazard insurance policy. (Dunnery Aff. 3, July 19, 2006.) Plaintiffs failed to respond to this evidence or to show that they were harmed in any other way from the alleged breach. Therefore, assuming Defendants breached the Security Deed by obtaining the insurance, the Haufs have failed to show that damages flowed from that breach. Summary judgment is therefore granted for the Defendants on that breach of contract claim.

Regarding the remaining breach of contract claims, the Court finds that genuine issues of material fact exist to be tried. Summary judgment is therefore inappropriate, and the parties' motions are denied.

     5. *Punitive Damages*[3]

Finally, Defendants move for summary judgment contending that punitive damages in this case cannot exceed the statutory cap of $250,000. Punitive damages may be awarded where the "defendant[s'] actions show[] willful misconduct, malice, fraud, wantonness, oppression, or . . . conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Typically, punitive damages are limited to a maximum amount of $250,000. O.C.G.A. § 51-12-5.1(g). If, however, "it is found that the defendant acted, or failed to act, with the

---

[3] The Court notes that "[p]unitive damages are not available in actions for breach of contract." *Trust Co. Bank v. Citizens & S. Trust Co.*, 260 Ga. 124, 126, 390 S.E.2d 589, 592 (1990); O.C.G.A. § 13-6-10. Consequently, Plaintiffs can only recover punitive damages on their attempted wrongful foreclosure tort claim.

16

specific intent to cause harm," there is no limit on the amount of punitive damages that can be awarded. O.C.G.A. § 51-12-5.1(f).

Plaintiffs contend that they are entitled to punitive damages in excess of the $250,000 cap because Defendants acted with a "conscious disregard of consequences" and "intentionally set out to cause harm to [] Plaintiffs." (Compl. ¶ 63.) Defendants claim that any punitive damage award should be limited to the statutory maximum because Defendants' actions were without intent to harm. "'Intent' is defined . . . to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Viau v. Fred Dean, Inc.*, 203 Ga. App. 801, 804, 418 S.E.2d 604, 608 (1992) (citations and internal quotation marks omitted). Construing the facts in the light most favorable to Plaintiffs, the Court finds that material questions exist as to whether Defendants' actions were committed with an intent to harm—i.e., that Defendants knew that their actions were substantially likely to cause the Haufs harm. Consequently, Defendants' Motion for Summary Judgment on Plaintiffs' punitive damage claim is denied.

### III. Motion to Amend

Plaintiffs originally filed their Complaint on September 26, 2005. The deadline for amending pleadings was January 15, 2006. On June 13, 2006, with the consent of Defendants, Plaintiffs amended their Complaint to assert a claim for breach of contract. Motions for summary judgment were filed in July 2006 based on the claims in Plaintiffs' Amended Complaint. On August 10, 2006, Plaintiffs moved to amend their Complaint to assert a claim for loss of consortium. Defendants oppose Plaintiffs' motion arguing that the amendment is

17

futile, untimely, and would create undue prejudice to Defendants. For the following reasons, Plaintiffs' motion is denied.

Where a plaintiff moves to amend his complaint after the defendant has filed his answer, the plaintiff may amend "only by leave of court or by written consent of the adverse party." Fed. R. Civ. P. 15(a). Leave to amend should be "freely given when justice so requires." *Id*. However, "a motion to amend may be denied on numerous grounds such as undue delay, undue prejudice to the defendants, and futility of the amendment." *Brewer-Giorgio v. Producers Video, Inc.*, 216 F.3d 1281, 1284 (11th Cir. 2000).

Here, Plaintiffs have failed to provide good reason for their seven-month delay in filing the motion to amend their pleadings. Instead, Plaintiffs summarily argue that they have not acted in bad faith, that there is no undue delay, and that there would be no prejudice to the Defendants if the Complaint were amended at this stage. The Court disagrees.

Plaintiffs, with Defendants consent, amended their Complaint after the deadline for amended pleadings passed. At that time, Plaintiffs could have asserted their claim for loss of consortium; Plaintiffs admit that they knew about the loss of consortium claims as derivative of the wrongful foreclosure and breach of contract claims.[4] Instead of asserting these claims with the Amended Complaint, Plaintiffs waited until after the parties filed motions for summary judgment and the briefing on Plaintiffs' Motion for Summary

---

[4]Plaintiffs contend that they "are seeking to formally amend the pleadings to make it clear that they are, and have been, asserting claims for damages for loss of consortium." (Pls.' Reply to Defs.' Resp. to Pls.' Mot. to Am. Compl. 3.)

18

Judgment was complete. Plaintiffs first mention their loss of consortium claims in Plaintiffs' response to Defendants' Motion for Summary Judgment. Plaintiffs give no explanation for this delay.

Defendants have therefore been prejudiced by Plaintiffs' delay because they were unaware of all of Plaintiffs claims when asserting their arguments for and against summary judgment. In order to rectify this prejudice, the Court would have to reopen discovery, allow Defendants to re-depose Plaintiffs, and allow Defendants to file dispositive motions concerning the loss of consortium claims. This would further prejudice Defendants. Consequently, since Plaintiffs offer no good reason for their delay, and since Defendants would be further prejudiced by the amendment, the Court denies Plaintiffs' Motion to Amend Complaint. *See Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 470 F.3d 1036, 1041-42 (11th Cir. 2006) (upholding denial of motion to amend where district court found delay and lack of good cause for the delay).

CONCLUSION

In sum, Plaintiffs' Motion to Join (Doc. 29) is granted. Plaintiffs' Motion for Partial Summary Judgment (Doc. 42) and Motion to Amend (Doc. 64) are denied. Defendants' Motion for Summary Judgment (Doc. 46) is granted in part and denied in part. Specifically, Plaintiffs' claims for the 2005 attempted wrongful foreclosure, 2001 breach of contract, and 2005 breach of contract, except for the breach of contract claim premised upon HomEq's purchase of hazard insurance, remain for trial.

IT IS SO ORDERED this 9th day of February, 2007.

          S/Clay D. Land
          CLAY D. LAND
          UNITED STATES DISTRICT JUDGE